COURT OF APPEALS
DECISION
DATED AND FILED

August 13, 2019

Sheila T. Reiff
Clerk of Court of Appeals

NOTICE

This opinion is subject to further editing.  If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.  *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.  **2018AP1673-CR**

Cir. Ct. No.  2017CT263

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

  PLAINTIFF-RESPONDENT,

 V.

YUNUS E. TURKMEN,

  DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Dunn County: JAMES M. PETERSON, Judge.  *Affirmed*.

¶1    STARK, P.J.[1]  Yunus Turkmen appeals a judgment of conviction, entered upon his guilty plea, to second-offense operating a motor vehicle while

---

[1]  This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2017-18).  All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

intoxicated (OWI). He claims the circuit court erred by denying his motion to suppress evidence. We disagree and affirm.

## BACKGROUND

¶2    City of Menomonie police officer Wade Schlichting stopped Turkmen and arrested him for OWI. Turkmen filed a motion to suppress evidence, alleging that Schlichting impermissibly extended the traffic stop to administer field sobriety tests. Schlichting was the only witness at the suppression hearing and testified to the following relevant facts.

¶3    At 2:38 a.m. on a Saturday morning in downtown Menomonie, Schlichting was parked in a lot adjoining Broadway Street. He saw a vehicle make a U-turn in the middle of an intersection and heard the vehicle's wheels squeal loudly. Schlichting followed the vehicle for a few blocks and then initiated a traffic stop.

¶4    Schlichting approached the vehicle's passenger side and spoke to the driver, later identified as Turkmen. Turkmen already had his wallet in his hand when Schlichting arrived. However, when Schlichting asked Turkmen for his driver's license, Turkmen "set his wallet onto the center console and proceed[ed] to stick his hands in his pockets to look for his wallet" before he finally handed over his entire wallet to Schlichting.

¶5    Schlichting never had met Turkmen previously, but Schlichting recognized him because Turkmen had been "running back and forth" on Broadway Street's sidewalk approximately thirty minutes prior to the traffic stop. "[S]everal establishments" sold alcoholic beverages in the area where Schlichting had previously observed Turkmen.

¶6    Schlichting asked Turkmen if he knew why he was stopped. In response, Turkmen "made a reference about his friend telling him to do something cool," apparently referencing the U-turn and tire squealing. Schlichting also asked Turkmen how much he had to drink that evening. Turkmen "indicated he had consumed one shot of alcohol[,] and he indicated something similar to the effect that he had consumed alcohol but not too much that he could not drive." At this point, Schlichting decided to administer field sobriety tests to Turkmen. Turkmen failed the field sobriety tests, and a preliminary breath test showed that he had a blood alcohol concentration of 0.131.

¶7    The circuit court denied Turkmen's suppression motion. It found the facts as testified to by Schlichting were "relatively undisputed." The court recounted that Schlichting "observed an illegal U-turn in [the business district]—it being illegal because you can't do a U-turn in the business district—and it's right on … Broadway Street … in an area where there's a number of bars." The court noted that "it wasn't just a U-turn," but also that the vehicle had "extra acceleration and [a] squealing of the tires," which, given the location and time of day, it opined was "a fairly dangerous driving maneuver." Based on those facts, the court concluded Schlichting "had a reason to stop [Turkmen] based on an observed violation."

¶8    The circuit court also determined that Schlichting reasonably extended the stop to administer field sobriety tests to Turkmen. In addition to Turkmen's driving behavior, the court observed that the stop took place "near bar close" and that Schlichting saw Turkmen thirty minutes prior to the stop in an area where a number of bars were located. The court also recounted that Turkmen "had his wallet ready and then when asked for his license, he appeared to be looking for the wallet that he already had out, and made some admission to having

3

consumed alcohol." The court further noted that Schlichting was not "foreclosed" by the amount of alcohol that Turkmen claimed he had consumed. Turkmen ultimately pleaded guilty to second-offense OWI, and he now appeals the court's denial of his suppression motion. *See* WIS. STAT. § 971.31(10).

## DISCUSSION

¶9 Turkmen concedes on appeal that Schlichting's initial decision to stop him was lawful because Schlichting had reasonable suspicion that Turkmen was operating his vehicle at a greater than reasonable and prudent speed while completing the U-turn, as evidenced by the squealing of his vehicle's tires. *See* WIS. STAT. § 346.57(2). Consequently, the sole issue before us is whether Schlichting's extension of the traffic stop to administer field sobriety tests was unconstitutional under the Fourth Amendment.

¶10 Whether a defendant's Fourth Amendment rights have been violated is a question of constitutional fact. ***State v. Hogan***, 2015 WI 76, ¶32, 364 Wis. 2d 167, 868 N.W.2d 124. A question of constitutional fact is a mixed question of law and fact to which we apply a two-step standard of review. ***Id.*** We will uphold the circuit court's findings of historical fact unless they are clearly erroneous. ***Id.*** We independently decide, however, whether the facts establish a violation of constitutional standards. ***Id.***

¶11 The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. *See* U.S. CONST. amend. IV. Law enforcement officers may stop a vehicle when they have reasonable suspicion to believe a motorist is engaged in wrongful conduct. *See* ***State v. Iverson***, 2015 WI 101, ¶52, 365 Wis. 2d 302, 871 N.W.2d 661. However, a traffic stop can become

4

unlawful if it is "prolonged beyond the time reasonably required" to complete the traffic stop's mission. *Hogan*, 364 Wis. 2d 167, ¶34 (citation omitted).

¶12 After a justifiable stop is made, police officers are permitted to expand the scope of their inquiry "only to investigate 'additional suspicious factors'" that come to the officers' attentions. *Id.*, ¶35 (citation omitted). "An expansion in the scope of the inquiry, when accompanied by an extension of time longer than would have been needed for the original stop, must be supported by reasonable suspicion." *Id.* (citing *State v. Colstad*, 2003 WI App 25, ¶13, 260 Wis. 2d 406, 659 N.W.2d 394). We assess the reasonableness of a traffic stop's extension based upon the totality of the facts and circumstances. *See Hogan*, 364 Wis. 2d 167, ¶36. Here, we must determine whether Schlichting discovered information subsequent to the initial stop which, when combined with information he already acquired, would have provided a reasonable law enforcement officer in his position with reasonable suspicion that Turkmen was driving while under the influence of an intoxicant, thus providing a basis to extend the stop to administer field sobriety tests. *See Colstad*, 260 Wis. 2d 406, ¶19.

¶13 We agree with the circuit court that, based upon the totality of the facts and circumstances, Schlichting reasonably extended the stop to administer field sobriety tests to Turkmen. The stop occurred at 2:38 a.m. on a Saturday morning, which is relevant because it was at bar-closing time, and it "is a matter of common knowledge that people tend to drink during the weekend when they do not have to go to work the following morning." *See State v. Lange*, 2009 WI 49, ¶32, 317 Wis. 2d 383, 766 N.W.2d 551. Further, Schlichting saw Turkmen "running back and forth" in close proximity to bars just prior to the stop. Turkmen also admitted to having consumed alcohol and displayed some confusion when trying to locate his driver's license.

¶14     Additionally, Turkmen's driving prior to the stop evinced the type of poor decision-making and increased impulsivity one would expect from a person driving while under the influence of an intoxicant.  Turkmen made a U-turn and squealed his vehicle's tires in a business district.  Regardless of whether the U-turn was legal, the circuit court characterized it as "fairly dangerous" because it occurred at bar close in an area populated with bars and, importantly, patrons leaving those bars.[2]  Moreover, Turkmen's ill-considered decision to conduct a U-turn at an unsafe speed was in response to his "friend telling him to do something cool"—i.e., a dare.  Considering the totality of the facts and circumstances before and during the stop, Schlichting reasonably suspected Turkmen of driving under the influence of an intoxicant and, therefore, lawfully extended the stop to administer field sobriety tests to Turkmen.

¶15     Turkmen acknowledges that "this is a close case," but he nonetheless asserts that Schlichting's extension of the stop was unlawful because the totality of the facts and circumstances available to Schlichting was "equivocal at best."  Turkmen first argues that "there is no reasonable basis to conclude [his] turn was 'a fairly dangerous driving maneuver.'"  He contends that "[t]he context in which the circuit court made this remark shows its characterization was based on the court's belief the U-turn was an 'illegal maneuver.'"  We disagree.  While the

---

[2] Turkmen asserts that his U-turn was not illegal for a variety of reasons and that the State conceded the U-turn's legality by failing to respond to his argument.  *See Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979) (observing that unrefuted arguments may be deemed conceded).  However, we need not address whether or not the U-turn was legal.  Turkmen concedes there was reasonable suspicion to stop his vehicle.  He further acknowledges that his squealing tires during the U-turn supported a reasonable inference that he was operating at a greater than reasonable and prudent speed in violation of WIS. STAT. § 346.57(2).  In addition, we conclude that Schlichting had reasonable suspicion to extend the traffic stop without relying on the legality of Turkmen's U-turn.  Therefore, the U-turn's legality is immaterial.

court did opine on the illegality of the U-turn, we do not infer from the court's comments that its finding that Turkmen's U-turn was a potentially "fairly dangerous driving maneuver" was directly connected to the court's belief that the U-turn was illegal. Rather, the court made that comment in the context of the U-turn occurring "in that place at that time," referring to "Broadway Street[,] … an area where there's a number of bars" and the time of day being when bars close on a Saturday morning.

¶16 Additionally, and contrary to Turkmen's contention, Schlichting's testimony supports the circuit court's conclusion that the U-turn was dangerous given the U-turn's time and place. The court could reasonably infer that an area with a number of bars, as was the case here, would be populated with patrons outside those bars while leaving at bar close who would be in potential jeopardy from a vehicle driven at an unreasonable and imprudent speed. *See Lange*, 317 Wis. 2d 383, ¶32.

¶17 Turkmen's remaining arguments are without merit because they fail to correctly analyze the situation under the totality of the facts and circumstances. He focuses on facts or circumstances that were absent, such as Schlichting not observing Turkmen slurring his speech, exhibiting "bloodshot or glassy eyes," or smelling of alcoholic beverages. As explained above, however, Schlichting had a reasonable suspicion that Turkmen was under the influence of an intoxicant based upon the totality of the facts and circumstances that actually occurred. We assess whether reasonable suspicion exists based upon the accumulation of facts that actually occurred. *See State v. Post*, 2007 WI 60, ¶10, 301 Wis. 2d 1, 733 N.W.2d 634 ("[T]he officer 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' the intrusion of the stop.") (citation omitted).

7

¶18 Turkmen's isolating certain facts in an attempt to minimize their probative value is similarly unpersuasive. Schlichting was not required to accept an inference of Turkmen's behavior that favored innocence when there also was a reasonable inference that Turkmen was engaged in wrongful conduct. *See State v. Nieves*, 2007 WI App 189, ¶14, 304 Wis. 2d 182, 738 N.W.2d 125. Thus, in this instance, whether there may have been an innocent explanation for Turkmen's confusion locating his wallet is immaterial in determining whether reasonable suspicion existed.

¶19 Finally, while Turkmen correctly argues that "[n]ot every person who has consumed alcoholic beverages is 'under the influence,'" *see* WIS JI—CRIMINAL 2663 (2006), that does not mean that Schlichting was required to take at face value the amount of alcoholic beverages Turkmen claimed to have consumed. *See Colstad*, 260 Wis. 2d 406, ¶¶14, 21. Here, and contrary to Turkmen's assertion otherwise, Schlichting reasonably suspected that Turkmen had consumed enough alcoholic beverages to impair his ability to safely operate a motor vehicle based upon the totality of the other facts and circumstances known to Schlichting at the time. Turkmen's running back and forth in the downtown bar area before closing time and his dangerous driving shortly thereafter in the same area, his admission to consuming alcohol, and his confusion in locating his driver's license would reasonably lead an officer in Schlichting's position to believe that Turkmen had consumed more alcoholic beverages than he admitted to and that Turkmen's consumption of alcoholic beverages impaired his ability to operate a motor vehicle. Schlichting's extension of the stop to conduct field sobriety tests was reasonable under those circumstances.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.