STATE of Wisconsin, Plaintiff-Respondent,

v.

Guy W. COLSTAD, Defendant-Appellant.†

Court of Appeals

*No. 01–2988–CR. Oral argument June 13, 2002.—Decided January 30, 2003.*

2003 WI App 25

(Also reported in 659 N.W.2d 394.)

---

† Petition to review denied 4-22-03.

On behalf of the defendant-appellant, the cause was submitted on the briefs of and oral argument by *T. Christopher Kelly* of *Kelly & Habermehl, S.C.*, Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the briefs of *William C. Wolford*, assistant attorney general, and *James E. Doyle*, attorney general. There was oral argument by *William C. Wolford*.

Before Vergeront, P.J., Roggensack and Lundsten, JJ.

¶ 1. LUNDSTEN, J. Guy W. Colstad appeals a judgment of the circuit court convicting him of homicide by use of a vehicle while having a prohibited alcohol concentration, contrary to WIS. STAT. § 940.09(1)(b) (1997–98).[1] Colstad argues that the results of his blood test should have been suppressed because (1) neither probable cause of a civil traffic violation, nor reasonable suspicion of a crime, supported the initial investigative detention of Colstad; (2) the initial detention was not temporary, but was instead an illegal *de facto* arrest; (3) the facts known to the investigating officer did not provide reasonable suspicion of intoxication and, therefore, Colstad should not have been subjected to field sobriety tests; and (4) the results of the preliminary breath test should not have been considered by the trial court when assessing whether probable cause supported both Colstad's arrest and the subsequent blood draw. We disagree with each of Colstad's arguments and affirm.

---

[1] All references to the Wisconsin Statutes are to the 1997–98 version unless otherwise noted.

## *Background*

¶ 2. On April 21, 2000, the pickup truck Colstad was driving collided with a child, causing severe injuries to the child, who later died. The responding officer testified that the collision occurred at about sunset, that there were no cars or trees obscuring the view alongside the road, that the road was straight, and that the view was "[a]bsolutely clear." The speed limit where the collision occurred was twenty-five miles per hour. The seriously injured child lay "to the front" of Colstad's pickup truck. The child's injuries appeared so severe that the officer believed the child would die.

¶ 3. After briefly observing the scene, the officer made contact with Colstad at approximately 8:17 p.m. Colstad reported that the child darted out into the road and ran into the side of his truck. Colstad told the officer he had been driving approximately fifteen to twenty miles per hour because he noticed several children were present on one side of the street, and he was used to seeing lots of children in that area.

¶ 4. After speaking with Colstad for one or two minutes, the officer directed Colstad to wait at a location away from the accident scene. During this contact, the officer did not notice Colstad exhibiting signs of intoxication. The officer then proceeded to assist with providing CPR to the child. He also photographed and marked the scene. The officer described the scene as chaotic, with ambulances, fire trucks, and onlookers present.

¶ 5. Sometime later, the officer contacted Colstad a second time. During this second encounter, the officer detected a mild odor of intoxicants on Colstad, and Colstad admitted having had two beers that evening. At 9:02 p.m., the officer directed Colstad to perform field

sobriety tests and then administered a preliminary breath test. It is undisputed that the results of these tests, combined with other information, supplied probable cause to arrest Colstad for operating a vehicle while intoxicated. A subsequent test revealed that Colstad's blood alcohol content was .117%.

¶ 6. Colstad was charged with homicide by operation of a vehicle while under the influence of an intoxicant, homicide by operation of a vehicle with a prohibited alcohol concentration, and homicide by negligent operation of a vehicle. Colstad moved to suppress the test results from breath and blood samples taken from him, as well as the results of the field sobriety tests. The trial court denied the motion, and Colstad pled guilty to homicide by operation of a vehicle while having a prohibited alcohol concentration.

### *Discussion*

*A. Whether Colstad's Initial Detention was Justified by Reasonable Suspicion of a Civil Traffic Violation*

¶ 7. The State does not dispute that the officer seized Colstad when he directed Colstad to move to a location away from the accident scene and wait. We will assume a seizure occurred at this point in time. The State also appears to concede that evidence subsequently obtained, including the results of the field sobriety tests and the blood draw, should be suppressed if this initial temporary seizure was illegal. Thus, we must decide whether the initial investigative seizure violated Colstad's Fourth Amendment protection against unreasonable seizures.

¶ 8. In order to justify an investigatory seizure, "[t]he police must have a reasonable suspicion, grounded in specific articulable facts and reasonable

413

inferences from those facts, that an individual is [or was] violating the law." *State v. Gammons*, 2001 WI App 36, ¶ 6, 241 Wis. 2d 296, 625 N.W.2d 623. "The question of what constitutes reasonable suspicion is a common sense test: under all the facts and circumstances present, what would a reasonable police officer reasonably suspect in light of his or her training and experience." *State v. Young*, 212 Wis. 2d 417, 424, 569 N.W.2d 84 (Ct. App. 1997). Before initiating a brief stop, an officer is not required to rule out the possibility of innocent behavior. *State v. Anderson*, 155 Wis. 2d 77, 84, 454 N.W.2d 763 (1990). "A trial court's determination of whether undisputed facts establish reasonable suspicion justifying police to perform an investigative stop presents a question of constitutional fact, subject to *de novo* review." *State v. Sisk*, 2001 WI App 182, ¶ 7, 247 Wis. 2d 443, 634 N.W.2d 877.

¶ 9. The State argues there was reasonable suspicion to believe Colstad had committed a *criminal* violation, such as causing great bodily harm by negligent operation of a vehicle under WIS. STAT. § 346.62. We question whether the facts known to police amounted to probable cause to believe Colstad was criminally negligent,[2] but we need not resolve the issue. Rather, we agree with the State's contention that a temporary

---

[2] " '[C]riminal negligence' means ordinary negligence to a high degree, consisting of conduct that the actor should realize creates a substantial and unreasonable risk of death or great bodily harm to another . . . ." WIS. STAT. § 939.25(1). At the time Colstad was initially detained, the officer had neither smelled an odor of intoxicants nor observed Colstad exhibit any other sign of intoxication. There was no indication that Colstad was speeding, driving erratically, or deviating from his lane of traffic. At the same time, the unexplained nature of the colli-

investigative stop was justified by reasonable suspicion that Colstad violated a traffic ordinance.

¶ 10. The State argues that the facts known to police justified an investigative stop because the facts supplied reasonable suspicion to believe Colstad violated a traffic ordinance prohibiting inattentive driving. Colstad responds that an officer must possess *probable cause* before detaining a citizen based on suspicion of any civil infraction; that mere reasonable suspicion only justifies an investigatory stop if the suspected offense is a crime.

¶ 11. This court addressed the applicability of the reasonable suspicion standard to a non-criminal traffic violation in *State v. Griffin*, 183 Wis. 2d 327, 515 N.W.2d 535 (Ct. App. 1994). In *Griffin*, we held that an officer may perform an investigatory stop of a vehicle based on a reasonable suspicion of a non-criminal traffic violation. *See id.* at 331–34. This holding was followed and aptly described in *Gammons*, 2001 WI App 36 at ¶¶ 7–9.

> In [*Griffin*], we held that "the absence of a registration plate, and reasonable inferences that can be drawn from that fact, constitute[] reasonable suspicion sufficient to justify an investigatory stop of a motor vehicle." In *Griffin*, the defendant's vehicle bore a "license applied for" sign. We reasoned that, without stopping the vehicle, the officers in *Griffin* had no way of knowing whether the defendant was in violation of vehicle registration laws.

*Id.* at ¶ 7 (citations omitted). The state supreme court also relied on *Griffin* when it explained: "[A]n officer

sion, especially in light of Colstad's assertion that he was driving slowly and looking out for children, was cause for some suspicion.

may make an investigative stop if the officer 'reasonably suspects' that a person has committed or is about to commit a crime, or reasonably suspects that a person is violating the non-criminal traffic laws . . . ." *County of Jefferson v. Renz*, 231 Wis. 2d 293, 310, 603 N.W.2d 541 (1999) (footnote and citations omitted).[3]

¶ 12. We acknowledge that some United States Supreme Court cases seemingly assume that probable cause is needed to support a stop for civil infractions. *See, e.g., City of Indianapolis v. Edmond*, 531 U.S. 32, 51 (2000) ("The reasonableness of an officer's discretionary decision to stop an automobile . . . turns on whether there is probable cause to believe that a traffic violation has occurred."); *Whren v. United States*, 517 U.S. 806, 810 (1996) ("[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."). However, we have not found any United States Supreme Court decision squarely addressing this topic. Taking the *Whren* decision as an example, the Tenth Circuit explains:

> In *Whren*, the [United States Supreme] Court stated that, "[a]s a general matter, the decision to stop an

---

[3] We note that courts in other jurisdictions permit an investigatory stop for civil infractions. *See United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (holding that "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring"); *Berge v. Comm'r of Pub. Safety*, 374 N.W.2d 730, 732–33 (Minn. 1985) (reasonable suspicion of failing to stop at a stop sign); *State v. Farabee*, 22 P.3d 175, 178–79 (Mont. 2000) (reasonable suspicion of driving with inoperable headlight); *State v. Henderson*, 966 P.2d 137, 140–41 (Mont. 1998) (reasonable suspicion of operating without required license plates); *State v. Ova*, 539 N.W.2d 857, 858–60 (N.D. 1995) (reasonable suspicion of careless driving).

automobile is reasonable where police have probable cause to believe that a traffic violation has occurred." . . .

While [*Whren* and similar cases] indicate that probable cause is a *sufficient* ground for a stop, none of them indicates that it is *necessary* for a stop. Other Supreme Court and Tenth Circuit cases have held that reasonable articulable suspicion is also sufficient grounds to justify a stop.

*United States v. Callarman*, 273 F.3d 1284, 1286 (10th Cir. 2001) (citations omitted).

¶ 13. Accordingly, we are bound to follow the rule set out in *Griffin*. *See Cook v. Cook*, 208 Wis. 2d 166, 189–90, 560 N.W.2d 246 (1997). Because Colstad's temporary detention was proper *if* supported by reasonable suspicion that Colstad violated a civil traffic ordinance, we proceed to address whether the facts known to police constituted reasonable suspicion.

██

¶ 14. The undisputed testimony demonstrates that the collision occurred on a straight road with "absolutely clear" conditions and no trees, obstructions, or parked cars on the side of the road. Colstad explained that, although he was driving slowly because he knew children were in the area, a child ran into the road and into the side of his pickup truck. One possible explanation is that provided by Colstad: Colstad was exercising due care and the child darted into his path.[4] However, another reasonable explanation is that Col-

---

[4] The evidence does not specify exactly where the child lay in relation to Colstad's truck. We only know that the child lay "to the front" of Colstad's truck. This might mean in front of his truck or to the side of his truck near the front, but behind the front.

stad hit the child because Colstad was not exercising proper attentiveness. The officer was not required to believe Colstad's explanation. Therefore, we conclude that the officer possessed a reasonable suspicion that Colstad was guilty of inattentive driving, contrary to WIS. STAT. § 346.89(1).[5]

### B. Whether Colstad's Detention was an Illegal De Facto Arrest

¶ 15. Colstad next argues that his detention was not "temporary," but was instead a *de facto* arrest because of its extended duration. He further argues that his *de facto* arrest was illegal because it was not supported by probable cause.

¶ 16. A brief investigatory stop is permitted when the length and scope of a detention is reasonable:

> For the stop of a person to pass constitutional muster as investigatory, the detention must be temporary and last no longer than is necessary to effect the purpose of the stop. "Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." A hard and fast time limit rule has been rejected. In assessing a detention for purposes of determining whether it was too long in duration, a court must consider "whether the police diligently pursued a means of investigation that was likely to confirm or

---

[5] WISCONSIN STAT. § 346.89(1) reads: "No person while driving a motor vehicle shall be so engaged or occupied as to interfere with the safe driving of such vehicle." The punishment for violating § 346.89(1) is a fine of not less than $20 nor more than $400. *See* WIS. STAT. § 346.95(2).

dispel their suspicions quickly, during which time it is necessary to detain" the suspect. In making this assessment, courts "should not indulge in unrealistic second-guessing." In assessing a detention's validity, courts must consider the " 'totality of the circumstances—the whole picture,' " because the concept of reasonable suspicion is not " 'readily, or even usefully, reduced to a neat set of legal rules.' "

*State v. Wilkens*, 159 Wis. 2d 618, 625–26, 465 N.W.2d 206 (Ct. App. 1990) (internal footnoted citations omitted).

¶ 17. Colstad argues that the duration of his detention was unreasonable because the officer directed him to wait, instead of questioning Colstad sufficiently to dispel or confirm the officer's suspicions, and because Colstad was made to wait approximately thirty to forty-five minutes before the officer resumed questioning. The State responds that the duration of the detention was reasonable given the chaotic accident scene and need for the officer to attend to the victim and process the scene. We agree with the State.

¶ 18. Between the first and second contacts with Colstad, the officer was providing medical assistance to the injured child, investigating the scene, taking photographs, and marking the scene. It was reasonable for the officer to direct Colstad to wait while the officer performed these tasks. Furthermore, to the extent the officer made observations about the victim and the scene during this time, the officer was acting to dispel or confirm his suspicions, consistent with the purpose of a temporary investigative stop. Accordingly, we reject Colstad's contention that his temporary detention became a *de facto* arrest at some point prior to the time the officer resumed speaking with him.

## C. Propriety of Continued Detention
## to Administer Field Sobriety Tests

¶ 19. Colstad next argues that the officer's second contact with him elicited no new information that would justify continuing Colstad's detention to administer field sobriety tests. We disagree.

> If, during a valid traffic stop, the officer becomes aware of additional suspicious factors which are sufficient to give rise to an articulable suspicion that the person has committed or is committing an offense or offenses separate and distinct from the acts that prompted the officer's intervention in the first place, the stop may be extended and a new investigation begun. The validity of the extension is tested in the same manner, and under the same criteria, as the initial stop.

*State v. Betow*, 226 Wis. 2d 90, 94–95, 593 N.W.2d 499 (Ct. App. 1999). Thus, we must determine whether the officer discovered information subsequent to the initial stop which, when combined with information already acquired, provided reasonable suspicion that Colstad was driving while under the influence of an intoxicant.

¶ 20. Colstad acknowledges that the officer smelled a mild odor of alcohol during the second contact, but argues that a mild odor of alcohol alone does not provide reasonable suspicion because it is not illegal in Wisconsin to drive after consuming alcohol. Colstad further points out that the officer did not observe any other indication of intoxication, such as balance problems, slurred speech, or bloodshot eyes. Finally, Colstad asserts that accidents caused by a child darting into the path of a vehicle are typically not the fault of the driver, and thus the accident did not provide evidence of intoxicated driving, citing *State v. Caibaiosai*, 122 Wis.

2d 587, 603–04, 363 N.W.2d 574 (1985) (Abrahamson, J., dissenting) (suggesting that "a child who darts into the path of the car . . . from between parked cars" is a situation where the driver is not typically at fault).

¶ 21. We disagree that the only indication of Colstad's intoxication was the mild odor of alcohol, and repeat that the officer was not obliged to accept as true Colstad's assertion that the child suddenly darted into the path of his truck. The officer did not know what caused the collision, but he did know it was not caused by a child darting out from behind an obstruction, such as a parked car. Even assuming the child ran quickly toward Colstad's truck, typically a person driving slowly and watchful of nearby children can respond quickly if a child unexpectedly runs toward his or her car. A prudent driver would not pass so close to the children that he or she could not respond to a sudden move. Thus, one reasonable possibility was that Colstad struck the child with his pickup truck because his judgment and driving skills were impaired by alcohol. The officer properly extended the stop to conduct field sobriety tests.

*D. Whether the Result of the Preliminary
Breath Test was Properly Considered
When Assessing Probable Cause to Arrest*

¶ 22. Colstad argues that the officer lacked authority to administer a preliminary breath test (PBT) and that, without the result of that test, Colstad's subsequent arrest and blood draw were not supported by probable cause. In Colstad's view, this means the results of his subsequent blood test should have been suppressed.

¶ 23. WISCONSIN STAT. § 343.303 authorizes an officer to administer a preliminary breath test when the officer has "probable cause to believe" the person is violating or has violated a drunk driving law. In this context, " 'probable cause to believe' refers to a quantum of proof greater than the reasonable suspicion necessary to justify an investigative stop, . . . but less than the level of proof required to establish probable cause for arrest." *Renz*, 231 Wis. 2d at 316.

¶ 24. Colstad points to several undisputed facts and argues that they show the officer did not possess "probable cause to believe" Colstad had been driving while intoxicated. Colstad points out that during the balance-and-count test, he exhibited no problem with his balance; that during the walk-and-turn test, he only stepped off the imaginary line twice and there was no testimony that his mild "upper body sway" was significant; that during the alphabet test, he slurred only the letters L, M, N, and O, which he contends frequently sound slurred because people often accelerate through these letters in tune to the "ABC" song; and that at no other time did the officer observe Colstad slur his speech or exhibit a lack of proper balance. According to Colstad, if field sobriety tests are to serve any function, "persons who perform well on the tests should not be further detained."

¶ 25. Colstad's argument is based on a selective view of the evidence. It is true the officer testified that Colstad performed "better than most" on the field sobriety tests, but the officer's testimony nonetheless demonstrates that Colstad erred on each of the sobriety tests. Colstad began the balance-and-count test prematurely, indicating divided attention—a sign of intoxication. During the balance-and-count test, Colstad was

directed to count from one thousand one to one thousand thirty, but stopped including "one thousand" in his count upon reaching one thousand sixteen. He continued counting from seventeen to thirty without saying "one thousand." On the walk-and-turn test, Colstad twice failed to walk toe-to-heel in a straight line. Regarding the alphabet test, the officer rejected the characterization that Colstad simply accelerated during the letters L, M, N, and O. Rather, the officer asserted that Colstad slurred his speech during these letters. When Colstad's performance of the field sobriety tests is combined with the mild odor of intoxicants and the suspicious circumstance of Colstad's truck colliding with a child on an unobstructed street where Colstad was allegedly watching for children, the totality of the facts supports "probable cause to believe" Colstad was driving while intoxicated.

██

¶ 26. Accordingly, the officer possessed "probable cause to believe," within the meaning of Wis. Stat. § 343.303, and was authorized to administer the PBT.

¶ 27. Colstad contends the PBT result should not have been considered for two additional reasons: (1) the State failed to demonstrate at the suppression hearing, as required by Wis. Stat. § 343.303, that the PBT used was "approved by the department" for preliminary breath testing,[6] and (2) the PBT evidence was inadmissible at the suppression hearing under *State v.*

---

[6] Wisconsin Stat. § 343.303 reads, in relevant part:

 If a law enforcement officer has probable cause to believe that the person is violating or has violated s. 346.63(1) or (2m) or a local ordinance in conformity therewith, or s. 346.63(2) or (6) or 940.25 or s. 940.09 where the offense involved the use of a vehicle, . . . the officer, prior to an arrest, may request the person to provide a

*Doerr*, 229 Wis. 2d 616, 599 N.W.2d 897 (Ct. App. 1999), because it was not accompanied by expert testimony. We reject both arguments.

¶ 28. Colstad's statutory "approved by the department" argument has been waived. Before the circuit court, Colstad argued only that the PBT evidence was inadmissible under *Doerr* because it was not supported by expert testimony. Colstad did not apprise the circuit court that he was objecting under the "approved by the department" provision of WIS. STAT. § 343.303. *See State v. Caban*, 210 Wis. 2d 597, 604, 563 N.W.2d 501 (1997) (issues not presented to trial court will not be considered for the first time on appeal).[7]

¶ 29. Colstad's contention that expert testimony is a prerequisite for admission of a PBT result at a suppression hearing is not supported by *Doerr*. In *Doerr*, we concluded that, in a trial on a charge *other than* a motor vehicle violation, admission of a PBT

sample of his or her breath for a preliminary breath screening test using a device approved by the department for this purpose. The result of this preliminary breath screening test may be used by the law enforcement officer for the purpose of deciding whether or not the person shall be arrested for a violation of s. 346.63(1), (2m), (5) . . . or a local ordinance in conformity therewith, or s. 346.63(2) or (6), 940.09(1) or 940.25 and whether or not to require or request chemical tests as authorized under s. 343.305(3). The result of the preliminary breath screening test shall not be admissible in any action or proceeding except to show probable cause for an arrest, if the arrest is challenged, or to prove that a chemical test was properly required or requested of a person under s. 343.305(3).

[7] The *Doerr* decision states that "[t]he PBT device has not been approved by the DOT." *State v. Doerr*, 229 Wis. 2d 616, 624, 599 N.W.2d 897 (Ct. App. 1999). We assume this statement is directed at the particular PBT device used in *Doerr*. A current listing of approved PBTs is available from the Chemical Test Section of the Wisconsin State Patrol. *See* Note to WIS. ADMIN. CODE § TRANS 311.04.

.

.

result requires expert testimony to establish "the device's scientific accuracy and reliability and [to] prove compliance with accepted scientific methods as a foundation for the admission of the test results." *Doerr*, 229 Wis. 2d at 625. *Doerr* does not require that expert testimony accompany PBT results in cases involving motor vehicle violations. *See id*. at 622–25.

### *Conclusion*

¶ 30. For the above reasons, we sustain the trial court's decision to deny Colstad's suppression motion. We affirm Colstad's conviction.

*By the Court.*—Judgment affirmed.